2026 IL App (4th) 250894

NO. 4-25-0894

FILED
July 14, 2026
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ANTHONY JOSHUA LOVE, | ) | No. 23CF1241 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion
Justices Knecht and Vancil concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant, Anthony Joshua Love, was found guilty of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)) and one count of attempted predatory criminal sexual assault of a child (*id.* §§ 8-4, 11-1.40(a)(1)). The trial court sentenced him to a total of 90 years in prison. Defendant appeals, arguing (1) the evidence was insufficient to support his convictions for predatory criminal sexual assault of a child where the State's evidence failed to establish skin-to-skin contact between his hand and the victim's vagina; (2) the admission of secretly recorded phone calls between him and the victim's mother violated article 14 of the Criminal Code of 2012 (*id.* §§ 14-1 to 14-9) (referred to here as eavesdropping statutes); (3) the court erred in allowing the State to admit into evidence "sexually-charged" text messages he sent to the victim's mother; and (4) the court's imposition of a 90-year prison sentence was excessive. We reduce defendant's convictions for predatory criminal sexual

assault of a child (*id.* § 11-1.40(a)(1)) to convictions for aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)) and remand for a new sentencing hearing on those reduced charges. We otherwise affirm the court's judgment.

¶ 2                                                    I. BACKGROUND

¶ 3            In December 2023, a grand jury indicted defendant on two counts of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)) and one count of attempted predatory criminal sexual assault of a child (*id.* §§ 8-4, 11-1.40(a)(1)). The charges were based on allegations that defendant, an adult over the age of 17, sexually assaulted, or attempted to assault, B.Z., who the record shows was his 9-year-old former stepdaughter. Specifically, the indictment alleged that, on or about August 11 through 12, 2023, defendant knowingly and for the purpose of sexual gratification or arousal (1) committed an act of sexual contact, however slight, between his hand and B.Z.'s vagina (counts I and II) and (2) attempted to commit an act of sexual contact, however slight, between his hand and B.Z.'s breasts (count III).

¶ 4            Prior to trial, the State filed a motion *in limine* to admit recorded statements that defendant made during phone calls with B.Z.'s mother, Amanda Z. It alleged that while the investigation into the charged offenses was occurring, Amanda recorded two phone calls she had with defendant without his knowledge. According to the State, the phone calls occurred after the Illinois Department of Children and Family Services (DCFS) "inadvertently called" defendant, "tipping [him] off" about the investigation. It alleged that Amanda elected to record the phone calls on her own and not at the request of law enforcement or any other governmental agency once defendant began discussing " 'weird stuff' " regarding B.Z. and her sexuality. The State maintained the recordings were admissible under the fear-of-crime exemption to the eavesdropping statutes (*id.* § 14-3(i)). Following a hearing, the trial court granted the State's

motion.

¶ 5　　　　In January 2025, the matter proceeded to a jury trial. However, the jury could not reach a consensus during deliberations, and the trial court declared a mistrial.

¶ 6　　　　In April 2025, the matter proceeded to a second jury trial. Evidence showed that from 2017 to 2021, defendant and Amanda were married. B.Z. was born in November 2013. Although she was Amanda's child from a previous relationship, B.Z. believed that defendant was her biological father until after the date of the alleged offenses. Defendant had two biological sons from a prior relationship, both of whom were older than B.Z. Defendant and Amanda also had one son together during their marriage.

¶ 7　　　　At the time of trial, B.Z. was 11 years old. She testified she knew defendant as her "dad" and stated that she would visit his apartment "from time to time." B.Z. did not have her own room at defendant's apartment and would sleep in a bedroom with her siblings. Defendant had his own bedroom located "across the hall."

¶ 8　　　　B.Z. stated that the last time she visited defendant's apartment, he made her feel uncomfortable. She recalled that it was nighttime and she went to defendant's bedroom because she could not sleep. She was wearing a tank top, shorts, and underwear. While there, defendant "rubbed his fingers on [her] vagina." B.Z. stated that although defendant's hand was on her vagina, he asked her if what he was doing "felt, like, good on [her] thigh." B.Z. responded that it did feel good because she did not want defendant to get mad. She explained that defendant's hands were on top of her shorts "the first time, but then he went on top of [her] underwear."

¶ 9　　　　B.Z. testified she left defendant's room and returned to the other bedroom. When she still could not go to sleep, she went back to defendant's room. B.Z. stated that both she and defendant were on the bed and that he "tried to lift up [her] shirt." She left the room again, but

defendant called her back. When B.Z. went to defendant's room for the third time, he asked her to "rub his back and give him cold chills." She described "cold chills" as "where you take *** your fingertips and just *** slowly rub them along someone's back." B.Z. stated that she also scratched defendant's back. Eventually, B.Z. went back to the other bedroom and went to sleep.

¶ 10　　　　B.Z. testified that, on one of the occasions she was in defendant's bedroom, defendant "grab[bed] her butt." She stated that while she was lying on her stomach, defendant put his hands "in her pants and underwear" and she "immediately pulled his hand out." At the "end," defendant also gave B.Z. a hug.

¶ 11　　　　B.Z. recalled telling her mother about what happened and stated that she also went to a "meeting," where she spoke to someone named "Mr. Curt." B.Z. did not see defendant after telling her mother about what had happened.

¶ 12　　　　B.Z. additionally testified that defendant had bedbugs at his apartment "that summer" and that she and her siblings got bug bites. She thought defendant also got bug bites but did not remember scratching defendant's back because of them. B.Z. acknowledged being on her phone before bed on the evening of the alleged offenses. Defendant told her and her siblings to get off their electronic devices, while sounding "tired and angry." B.Z. also remembered that she played a game called "Pig" with defendant and her brothers before going to bed. She did not remember playing "Pig" with just defendant. Finally, B.Z. agreed that she had difficulty sleeping, in part, because her little brother took her blanket. At one point, she went to defendant's bedroom to ask for a blanket.

¶ 13　　　　Following B.Z.'s testimony, the trial court and the parties discussed defendant's objection to the admission of text messages defendant sent Amanda on the night of the alleged offenses, which the State intended to introduce during Amanda's testimony. In the text messages,

which were sent between 10:04 p.m. and 11:53 p.m. on August 11, 2023, defendant indicated he was trying to get in contact with a woman he knew for the purpose of having sex with her. Because the woman had "blocked" him, he asked Amanda to help him contact the woman, which Amanda declined to do.

¶ 14    In objecting to the admission of the text messages, defendant argued that his desire to have a sexual relationship with a consenting adult woman was not relevant to whether he committed the charged offenses against B.Z. He also contended that the messages were overly prejudicial. The State argued that the messages were relevant to show defendant's intent or state of mind. It also emphasized that the text messages were sent the same evening as the alleged offenses and asserted they helped establish a timeline of what occurred.

¶ 15    The trial court stated it would allow the admission of text messages with defendant "saying basically that he wants sex," finding them probative as to the issue of defendant's intent. It stated it had considered the "timeframe" of the messages, noting that if they had not occurred close in time to the alleged offenses, their probative value would have been low. The court stated it would exclude from the evidence the text messages that discussed defendant being "blocked" by the woman, along with proposed methods "to get around" being "blocked." It found the prejudice of those statements outweighed their probative value. Finally, the court stated it would also read a limiting instruction to the jury regarding the evidence.

¶ 16    The State then called Amanda as a witness. Amanda stated that she and defendant divorced in 2021, and that she had remarried. Defendant lived in an apartment approximately a mile from where Amanda resided with her new husband and their children. At the time of the alleged offense, one of defendant's older sons also resided with Amanda and her family. On Friday, August 11, 2023, defendant came to her house for dinner. After dinner, defendant took B.Z., his

older son, and the son he shared with Amanda to his apartment to spend the night.

¶ 17    Amanda testified that she and defendant did not have a contentious divorce and that prior to the alleged offenses, there were no issues between defendant and her new husband. Rather, defendant had the access code to her front door, and the two commonly communicated on the phone and through text messages. On occasion, defendant would also share with Amanda details of his personal life. Amanda identified screenshots of text messages she had with defendant on August 11, 2023, the night of the alleged offenses, beginning at 10:04 p.m. The screenshots were admitted into evidence, and the trial court read the following limiting instruction to the jury:

> "In regards to those exhibits, Ladies and Gentlemen, and the testimony around those exhibits, evidence is about to be received that the defendant has been involved in conduct other than that charged in the indictment. This evidence is being received on the issue of defendant's intent and may be considered by you only for that limited purpose.
>
> It is for you to determine whether the defendant was involved in that conduct, and if so, what weight should be given to this evidence on the issue of intent."

The text messages, which were also published to the jury, stated as follows:

> "[Amanda]: Reach who
>
> [Defendant]: Tina (couch pisser) lol I want sex [Emoji]
>
> I tried all social media
>
> My business phone but don't work
>
> I don't know way [*sic*] I'm so hard up for tho she not that great
>
> [Amanda]: Oh wow

You're *** wow

Why her[?]

[Defendant]: Cause I know I reach out she will respond and I could f*** her again

Well that what my brain thinks

I even googled

[Amanda]: Ah

okay.

[Defendant]: Yea I need help

[Amanda]: You see your psych soon yes

[Defendant]: The 25 y

[Amanda]: Just curious

[Defendant]: What that do cause I want to get some"

¶ 18    Amanda stated that her text messages with defendant occurred while the children were at his apartment and that she did not consider the messages to be "some type of joking conversation." The text messaging ended when Amanda went to sleep. The same night, Amanda also received a text message from B.Z. The State presented a screen shot of that message, which was admitted into evidence and published to the jury. The message, dated August 12, 2023, at 12:25 a.m., stated, "Mama me scared." Amanda testified she did not see the message from B.Z. until the next morning. She stated she was not concerned about B.Z. after seeing the text message, stating she communicated by phone with defendant "to check in," and she "confirmed that everything was normal and fine."

¶ 19    The Sunday following B.Z.'s visit to defendant's apartment, Amanda picked B.Z. up from cheer practice and noticed that B.Z. was not acting like her usual self. Later, she asked

B.Z. if she was sad about something, and B.Z. told her no. Amanda then asked B.Z. if she was feeling mad about something, and B.Z. told her that she was. When Amanda asked B.Z. what she was mad about, B.Z. "said daddy." Amanda asked for more details, and B.Z. ultimately disclosed that when she was at defendant's apartment, "he touched her vagina." Amanda stated that when B.Z. made her disclosure, she was "curled up" and had "her legs tucked under her." She noted that she had taught B.Z. the anatomically correct names for her body parts and recalled that B.Z. reported that defendant had touched her on either her vagina or vulva. Amanda stated that the next day, B.Z. "confirmed that it happened and verified that it was absolutely not an accident."

¶ 20　　　　Amanda testified she reported B.Z.'s disclosures to DCFS and took B.Z. for an interview at the Child Advocacy Center with Detective Curt Maas. Because she was concerned about defendant finding out that she made a report, Amanda pretended that she had no idea what was going on and acted like everything was fine. However, at some point, defendant became aware of the investigation when DCFS accidentally called him. Defendant then called Amanda to ask "why DCFS would have been reaching out to him." Amanda stated she decided to record her conversations with defendant "where he was discussing the allegations made by DCFS." She asserted that once she heard what defendant was saying, she "knew that other people needed to hear it too." Amanda denied being asked by law enforcement to record the calls and stated she feared defendant.

¶ 21　　　　Amanda recorded two phone calls she had with defendant. Recordings of both calls were admitted into evidence over defendant's objection. The State published a six-minute portion of the first phone call to the jury. During the call, defendant stated that if either his older son or B.Z. said that he "hurt them," he would probably "cut them off." He stated that such action would make him look guilty and that the relationship he had with the children would change. Defendant

denied doing anything wrong. He stated he had asked for "inappropriate back rubs" because he "grew up like that" and suggested that his actions could have been "misconstrued." Defendant also stated he "felt weird" about a conversation he had with B.Z., during which he asked her about her sexuality. He indicated that during the night of the alleged offenses, B.Z. was acting "weird" and kept getting out of bed. Defendant asserted they played "Pig," he gave B.Z. a blanket, and they hugged a couple of times. He also stated that he called B.Z. into his bedroom one time to scratch a bug bite that he could not reach.

¶ 22        According to Amanda, the second phone conversation she recorded with defendant occurred after she had taken B.Z. to be interviewed at the Children's Advocacy Center. The State played a portion of that call for the jury that was 54 seconds in length. During the call, defendant told Amanda that he was trying to keep his paranoia "in check" and that he wanted to know "who made the report." He asked Amanda if she "could go through [B.Z.'s] phone" to see if she said something to one of her friends. Defendant suggested that Amanda "go back and check *** from Saturday when [B.Z.] stayed the night with [him]." He then reiterated that he wanted Amanda "to go through [B.Z.'s] phone."

¶ 23        Amanda testified that during her second phone call with defendant, he asked her multiple times to go through B.Z.'s phone. She asserted that she tried to steer defendant away from believing that B.Z. was the source of the disclosure, stating she wanted "to see how [defendant] would react to different possibilities." Amanda found it unusual that defendant specifically asked her to check B.Z.'s phone "from Saturday." Amanda further testified that she was aware that defendant had problems with bedbugs at his apartment prior to August 2023. However, she stated that the apartment had been "treated" and that the issue had been resolved.

¶ 24        Curt Maas testified he was a detective for the City of Bloomington Police

Department. He specialized in investigating crimes against children and was trained as a forensic interviewer. Maas was assigned to B.Z.'s case, and on August 17, 2023, he interviewed B.Z. at the Children's Advocacy Center.

¶ 25    Maas testified that B.Z. was nine years old at the time of the interview and that she was able to appropriately answer the questions he asked. During the interview, B.Z. disclosed that "her father had done something inappropriate to her." Maas then summarized the details surrounding B.Z.'s disclosures, noting that she reported going into defendant's bedroom three separate times and that, on two of those occasions, defendant touched her vagina over her clothing. According to Maas, B.Z. also reported that defendant "tried to put his hand up her shirt" and "put his hand down the back of her pants."

¶ 26    The State submitted a recording of Maas's interview with B.Z. at the Children's Advocacy Center. Without objection, the recording was entered into evidence and published to the jury. The recording showed that, during the interview, B.Z. made disclosures consistent with Maas's testimony. She described staying the night at defendant's apartment with her brothers and going into defendant's bedroom on three separate occasions. She stated that she initially went to defendant's bedroom because she could not sleep. While there, defendant started rubbing her "private area," *i.e.*, where she urinated, with his hand. B.Z. also asserted that defendant first touched her private area on the outside of her clothing before putting his hand inside her shorts and touching her private area on the outside of her underwear.

¶ 27    B.Z. returned to the other bedroom, and defendant called her back to his room. She sat on his bed, and defendant, again, rubbed her private area on the outside of her shorts. B.Z. reported that defendant tried to lift her shirt, but she stopped him before he touched the "private part of [her] chest." Defendant also put his hand under her clothing and rubbed her buttocks. B.Z.

pulled defendant's hand out and told him to stop. Defendant said "okay" and told her to go to bed. B.Z. stated defendant then called her to his room a third time and told her to give him a hug. B.Z. gave defendant a hug but felt uncomfortable.

¶ 28    Maas testified that, after interviewing B.Z., he spoke with defendant, who he stated was born in March 1989. Specifically, on Monday, August 21, 2023, at approximately 11:15 a.m., Maas went to defendant's apartment. At the time, Maas had reason to believe that defendant knew about the investigation, stating he had been told by several different people that a DCFS investigator had inadvertently contacted defendant when trying to call Amanda. Maas was also aware that Amanda had talked to defendant about the children being interviewed at the Children's Advocacy Center.

¶ 29    Defendant agreed to speak with Maas, and Maas asked him about the night of the alleged offenses. Defendant confirmed that he had eaten dinner at Amanda's house and that he had taken B.Z., his older son, and his son with Amanda to his apartment. He stated he made the older children play a video game with his youngest son. He also played "Pig" with B.Z. and his youngest son in the living room. According to defendant, the children went to bed around midnight, and at 12:45 a.m., he had to yell at them for playing on their electronic devices. About 30 minutes later, B.Z. came to his bedroom because she could not sleep. Defendant reported that he was lying in his bed, facing away from B.Z., who sat at the foot of the bed. He spoke with B.Z., who then left his room and returned to the spare bedroom. Defendant told Maas that B.Z. came back to his room about 15 minutes later, stating she was cold. Defendant gave her the blanket from his bed, and B.Z. returned to the other bedroom. After 30 minutes, B.Z. returned to defendant's room and, again, stated she could not sleep. Defendant reported that he got up and played a game of "Pig" with B.Z. in the living room. He then gave her a hug, and she went back to bed.

- 11 -

¶ 30　　　　Maas testified that he asked defendant about B.Z. touching defendant's back. According to Maas, defendant "was trying to distance himself from [B.Z.]" and indicated that "he never had any physical interaction or any physical touching from her." Maas then confronted defendant with information he had received from Amanda that defendant stated B.Z. had touched or scratched his back. After being confronted with those statements, defendant told Maas that he had called B.Z. into his room one time "to have her scratch his back." Defendant denied ever touching B.Z.

¶ 31　　　　Defendant testified on his own behalf. He stated that in August 2023, he worked the night shift, from 7 p.m. to 7 a.m. He had worked the night before Maas visited him at his apartment and estimated that he had slept only about 45 minutes before Maas's arrival.

¶ 32　　　　Defendant recalled that on August 11, 2023, he had dinner at Amanda's house and returned to his apartment with the children. B.Z. and his oldest son were fighting, and he described B.Z.'s demeanor as being "very argumentative, upset, [and] feisty." Defendant stated he noticed differences in B.Z.'s demeanor prior to August 11, 2023. He stated that she appeared upset and quiet and that he had commented on her demeanor to Amanda approximately one week earlier.

¶ 33　　　　At defendant's apartment, the children played video games in his spare bedroom. While they were playing, he texted Amanda. Defendant asserted the children went to bed at 12:30 a.m. and that they played "Pig" before bed. Around 12:45 a.m., he had to tell the children to get off their electronic devices. Defendant asserted he was frustrated and described his voice as "stern." He stated B.Z. came to his room, sat on his bed, and said she could not sleep. She left and then came back about 10 minutes later and said she could not sleep and was scared. According to defendant, B.Z. told him she was scared of the bedbugs. Defendant testified he went to play "Pig" with B.Z., and they played six or seven games. He acknowledged previously telling Maas that he

and B.Z. had only played one game of "Pig" together. However, defendant asserted that at the time he talked to Maas, he was tired and had only had 45 minutes of sleep after being awake for "twenty-some hours."

¶ 34        After playing "Pig," B.Z. went back to her room before returning to defendant's room a third time, indicating that she needed a blanket. Defendant gave B.Z. a blanket, and she gave him a hug. As B.Z. started to leave the room, defendant called her back "to itch [his] back." He noted he had bedbugs at his apartment. Although he "had the first treatment, *** the process wasn't done yet." Defendant explained that he got bedbugs after buying a couch off Facebook Marketplace. Everyone was bitten by the bedbugs, but the bites "showed up more on [B.Z.] than the other kids." B.Z. also expressed that she did not like going to defendant's apartment because of the bedbugs.

¶ 35        Defendant stated that on Wednesday, August 16, 2023, he received a call from DCFS. At the time of the call, the unidentified caller "just asked for Amanda." Defendant asserted that he later learned from Amanda that the caller was from DCFS. He maintained that he asked Amanda to go through B.Z.'s phone because he was "being a concerned parent" and "trying to figure out what was going on." He suspected the DCFS investigation involved B.Z. because his older son was a loner and did not have many friends and his younger son was only five and spent most of his time at home. Defendant also suspected that B.Z. was involved based on her demeanor and because Amanda told him that B.Z.'s interview at the Children's Advocacy Center was lengthier than the other children's interviews. Defendant asserted that he mentioned the Saturday that B.Z. was at his residence because Amanda told him he was a suspect and he "was just trying to see if there was anything being said about anything."

¶ 36        Defendant acknowledged that when Maas came to his apartment, he was aware that

B.Z. had been interviewed at the Children's Advocacy Center. When Maas asked if he knew what was going on, he told Maas that he "had an idea what's going on, but [he] didn't know to the full extent of what was going on." Defendant stated it was possible that he responded to Maas by stating, " 'I don't have a clue,' " but he did not believe he made that statement twice. He also suggested such a statement was "just a term of phrase" that meant he did not know the full details of the DCFS investigation. Defendant asserted he "just knew some type of abuse was being alleged."

¶ 37　　　　Following defendant's testimony, the State called Amanda and Maas in rebuttal. Amanda testified that she did not remember defendant expressing concerns about B.Z. in the weeks leading up to the alleged offenses. Detective Maas testified his interview with defendant was recorded on his body camera. Maas's body camera recording was admitted into evidence, and a portion of the recording was published to the jury. The recording showed Maas arriving at defendant's apartment and defendant allowing him inside. Maas told defendant that he knew defendant had "been made aware of the investigation" or that something was going on and then asked defendant if he was "made aware of something." Defendant responded "yeah." Maas then asked defendant what he knew about why Maas was there and what was going on, and defendant twice stated, "I don't have a clue." Maas further testified that defendant told him his apartment had received a first round of treatment for bedbugs, that the bedbugs were gone, and that he was going to do another treatment.

¶ 38　　　　The jury found defendant guilty of each charged offense. Defendant filed a posttrial motion, arguing, in part, that (1) the trial court erred in granting the State's motion *in limine* to admit the statements he made during his recorded phone calls with Amanda, (2) the evidence was insufficient to prove his guilt beyond a reasonable doubt, and (3) the court erred in allowing the

admission of his text message communications with Amanda. In June 2025, the court denied defendant's posttrial motion. It then sentenced him to consecutive 45-year prison sentences for each predatory-criminal-sexual-assault-of-a-child count and a concurrent 12-year prison sentence for the attempted-predatory-criminal-sexual-assault-of-a-child count.

¶ 39            This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41                              A. Sufficiency of the Evidence

¶ 42            On appeal, defendant first argues that the State failed to prove him guilty of predatory criminal sexual assault of a child, as alleged in counts I and II (720 ILCS 5/11-1.40 (West 2022)). Specifically, he contends that although the charging statute requires "skin-to-skin touching" to establish the commission of that offense, the State's evidence "at most indicated that [he] touched B.Z. through her clothing." Defendant asserts that, under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), this court has the authority to reduce the degree of the offense of which a defendant is convicted. He requests that we reduce his convictions in counts I and II to the lesser-included offense of aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (West 2022)) and remand the matter for a new sentencing hearing on those reduced convictions. The State concedes the issue.

¶ 43            When presented with a challenge to the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the State and "determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. As charged here, a person commits predatory criminal sexual assault of a child by being 17 years of age or older and committing "an act of contact, however slight, between the sex organ *** of one person and the part of the body of

another for the purpose of sexual gratification or arousal of the victim or the accused," with the victim being under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2022). The statute requires "direct contact between the sex organ *** of one person and any part of the body of another." *People v. Johanson*, 2024 IL 129425, ¶ 12. More specifically, "an element of predatory criminal sexual assault of a child is that there be skin-to-skin contact." *People v. Currie*, 2023 IL App (2d) 220114, ¶ 42; see *People v. Johnson*, 2023 IL App (4th) 220201, ¶¶ 21-24 (accepting the State's concession that touching "over [the victim's] clothes" was insufficient to prove "contact" for purposes of section 11-1.40(a)(1)); *People v. Hubbard*, 2024 IL App (5th) 220628-U, ¶ 115 (adopting the reasoning in *Currie* and finding "the State was required to prove skin-to-skin contact as an element of predatory criminal sexual assault of a child").

¶ 44    Here, both at trial and during her Children's Advocacy Center interview with Detective Maas, B.Z. reported only that defendant touched her vagina, or private area, on top of her shorts or on top of her underwear. No evidence was presented by the State that established direct contact between defendant's hand and B.Z.'s vagina underneath her clothing. Accordingly, we accept the State's concession that the evidence was insufficient to prove defendant guilty of predatory criminal sexual assault of a child, as alleged in counts I and II of the indictment.

¶ 45    However, as noted by both parties on appeal, this court is authorized to "reduce the degree of the offense of which the appellant was convicted." Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967). Ultimately, "[a] defendant 'has no right to an acquittal when the evidence, while insufficient to establish the greater offense, is sufficient to establish the lesser offense.' " *Johnson*, 2023 IL App (4th) 220201, ¶ 26 (quoting *People v. Kennebrew*, 2013 IL 113998, ¶ 43).

¶ 46    Here, the parties agree that aggravated criminal sexual abuse (720 ILCS 5/11-1.60 (West 2022)) is a lesser-included offense of predatory criminal sexual assault of a child and that

defendant's act of touching B.Z.'s vagina over her clothing would support a conviction for that lesser-included offense. Notably, though, they disagree on which subsection of the aggravated criminal sexual abuse statute should apply. In his brief, defendant cites and sets forth the elements of the offense as contained in subsection (c)(1)(i) of section 11-1.60. *Id.* § 11-1.60(c)(1)(i). In its brief, the State argues for application of subsection (b) or (f). *Id.* § 11-1.60(b), (f).

¶ 47 The relevant statute provides that a person commits aggravated criminal sexual abuse if he (1) "commits an act of sexual conduct with a victim who is under 18 years of age and the person is a family member" (*id.* § 11-1.60(b)); (2) is 17 years of age or over and "commits an act of sexual conduct with a victim who is under 13 years of age" (*id.* § 11-1.60(c)(1)(i)); or (3) "commits an act of sexual conduct with a victim who is but under 18 years of age and the person is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim" (*id.* § 11-1.60(f)). " 'Sexual conduct' " includes "any knowing touching or fondling by the *** accused, either directly or through clothing, of the sex organs *** of the victim *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. Importantly, a violation of subsection (b) or (c) of section 11-1.60, the aggravated criminal sexual abuse statute, is a Class 2 felony, while a violation of subsection (f) is a Class 1 felony. *Id.* § 11-1.60(g).

¶ 48 We note that "the charging instrument approach applies when determining whether an uncharged offense is a lesser-included offense of a charged offense." *Kennebrew*, 2013 IL 113998, ¶ 32. "[A]n offense is a lesser-included offense under the charging instrument approach if every element of the uncharged offense is contained in the indictment or if any element not listed in the indictment can be reasonably inferred from the indictment allegations." *Id.* ¶ 34.

¶ 49 In this case, counts I and II of the indictment both alleged that (1) defendant was

over 17 years of age, (2) defendant knowingly committed an act of sexual contact, however slight, between his hand and B.Z.'s vagina, (3) B.Z. was under 13 years of age, and (4) the sexual contact was for the purpose of defendant's or B.Z.'s sexual gratification or arousal. Clearly, the elements of aggravated criminal sexual abuse as set forth in subsection (c)(1)(i) of that statute are contained within the indictment. Specifically, that subsection requires (1) the defendant to be 17 years of age or over, (2) the victim to be under 13 years of age, and (3) an act of sexual conduct, which includes touching by the defendant of the victim's sex organ through clothing for the purpose of sexual gratification or arousal of the victim or the defendant. 720 ILCS 5/11-1.60(c)(1)(i), 11-0.1 (West 2022)).

¶ 50    Subsections (b) and (f) of the aggravated criminal sexual abuse statute (*id.* § 11-1.60(b), (f)) contain elements that are not specifically listed in the indictment. As noted, the charging instrument approach does not require an explicit reference to each element of an offense. However, when not explicitly listed, the element should be one that "can be reasonably inferred from the indictment allegations." *Kennebrew*, 2013 IL 113998, ¶ 34. Here, the State references subsections (b) and (f) without presenting any argument or analysis regarding why either subsection applies. More specifically, it fails to argue how the elements listed in those subsections, but not explicitly set forth in the indictment, can be reasonably inferred from the indictment allegations.

¶ 51    Accordingly, given the circumstances presented, we find aggravated criminal sexual abuse, as set forth in subsection (c)(1)(i) of the relevant statute (720 ILCS 5/11-1.60(c)(1)(i) (West 2022)), is a lesser-included offense of predatory criminal sexual assault, as charged in the present case. We also find the evidence at defendant's trial was sufficient to sustain convictions for that offense. Pursuant to Rule 615(b)(3), we reduce the degree of defendant's convictions for

predatory criminal sexual assault of a child in counts I and II to convictions for aggravated criminal sexual abuse (*id.*) and remand for a new sentencing hearing on those lesser-included offenses.

¶ 52                                B. Secretly Recorded Phone Calls

¶ 53         Defendant next argues that the trial court erred in granting the State's motion *in limine* and allowing the admission of the secretly recorded phone calls between him and Amanda. He contends the admission of such evidence violated the eavesdropping statutes (*id.* §§ 14-1 to 14-9) and that the fear-of-crime exemption (*id.* § 14-3(i)), through which the State sought admission of the recordings, was inapplicable.

¶ 54         Initially, defendant asserts that a *de novo* standard of review applies to this issue, citing case authority for the proposition that a trial court's ultimate legal ruling on whether suppression is warranted is reviewed *de novo*. See *People v. Davis*, 2021 IL 126435, ¶ 12 ("Because the issue *** concerns the circuit court's ultimate ruling on whether suppression was warranted, our review is *de novo*."). We note that, in the present case, the admissibility of the recorded phone calls was presented through the State's motion *in limine*, rather than through a motion to suppress. See *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 47 ("The trial court's evidentiary ruling on a motion *in limine* is reviewed for an abuse of discretion."). However, the State offers no objection or comment to defendant's assertion that *de novo* review applies and offers no other standard. Accordingly, we accept defendant's contention and consider *de novo* whether the court erred in allowing the admission of the recorded phone calls.

¶ 55         Under the eavesdropping statutes, it is unlawful for a person to use an "eavesdropping device" to surreptitiously record a private conversation without the consent of all parties to the conversation. 720 ILCS 5/14-2(a)(1) (West 2022). Evidence obtained in violation of the eavesdropping statutes is generally inadmissible in a criminal trial. *Id.* § 14-5. However, the

statute also sets forth various exemptions to its provisions. *Id.* § 14-3. Relevant to this appeal is what the parties refer to as the fear-of-crime exemption, which states as follows:

> "Recording of a conversation made by or at the request of a person, not a law enforcement officer or agent of a law enforcement officer, who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household, and there is reason to believe that evidence of the criminal offense may be obtained by the recording[.]"
>
> *Id.* § 14-3(i).

¶ 56　　　　Relevant to this case, a recording that was not consented to by all parties is permissible under the fear-of-crime exemption when (1) it is made by a party to the conversation who is not a law enforcement officer or agent, (2) the recording party has a reasonable suspicion that another party to the conversation has committed a criminal offense against the recording party or a member of the recording party's immediate household, and (3) the recording party has "reason to believe that evidence of the criminal offense may be obtained by the recording." *Id.* In this instance, there is no dispute that Amanda is not a law enforcement officer or agent and that she recorded the phone calls on her own and not at the behest of law enforcement. Additionally, defendant does not appear to dispute that Amanda had a reasonable suspicion that he committed a criminal offense against B.Z., a member of Amanda's immediate household. In fact, the record establishes that Amanda was B.Z.'s mother and the two resided together. Additionally, days prior to the recorded phone calls, B.Z. disclosed to Amanda the alleged sexual abuse by defendant. An investigation into B.Z.'s allegations was ongoing at the time of the calls.

¶ 57　　　　On appeal, defendant does challenge the final requirement of the fear-of-crime

exemption—that "there is reason to believe that evidence of the criminal offense may be obtained by the recording" (*id.*). He contends that requirement was not met because no evidence of a criminal offense was obtained by Amanda's recordings. Defendant asserts that (1) he did not admit to any criminal activity on the recordings, (2) Amanda's demeanor and comments on the phone calls failed to reflect that she was attempting to gain evidence of a criminal offense, (3) Amanda did not testify that she believed the recording would gather evidence of the offense, and (4) Amanda had no cause to fear further contact between defendant and B.Z., given that the DCFS investigation would prevent defendant from seeing B.Z.

¶ 58　　　　　Initially, we note that the fear-of-crime exemption only requires that the recording party have reason to believe that evidence of a crime *may* be obtained by the recording. The fact that no evidence of a crime is ultimately obtained would affect the relevancy of the recording as evidence at a trial; however, such circumstances do not render the exemption inapplicable. Here, the record shows that when the recorded phone calls occurred, Amanda was aware of B.Z.'s disclosures regarding defendant's recent alleged sexual abuse. Although Amdanda did not explicitly state that she believed she would obtain evidence of the alleged abuse during the phone calls, she did testify that the phone calls occurred after defendant became aware of the DCFS investigation and that she decided to record her conversations with defendant because "he was discussing the allegations made by DCFS." She maintained that once she heard what defendant was saying, she "knew that other people needed to hear it too." Such statements clearly suggest that Amanda believed defendant would make statements relevant to his sexual abuse of B.Z., a criminal offense he allegedly committed, during the calls that she recorded. Amanda's belief was reasonable based upon all the circumstances.

¶ 59　　　　　Again, Amanda's reasonable belief that evidence of a crime might be obtained by

the recording was all that was necessary. Contrary to defendant's suggestions on appeal, Amanda was not required to attempt to elicit any statements from defendant or question him in any particular way. Nor was it necessary that Amanda fear further criminal activity by defendant or additional contact between defendant and B.Z. Rather, it was sufficient that Amanda had a reasonable suspicion that defendant had already "committed a criminal offense" against B.Z.

¶ 60　　　　Moreover, we disagree with defendant's contention on appeal that no evidence of the alleged offenses was obtained through Amanda's recordings. Although defendant did not confess to committing the alleged sexual acts, he did make statements that were incriminating or were otherwise relevant to the charged offenses. Specifically, defendant discussed the DCFS investigation with Amanda and offered theories for how it might have been prompted. Despite not knowing the subject of the investigation or its details, he discussed the night that, according to B.Z., the alleged offenses occurred. He admitted that B.Z. kept getting out of bed and that, at one point, he called her into his bedroom. During the second phone call, defendant repeatedly asked Amanda to "go through" B.Z.'s cell phone and explicitly asked Amanda to check "from Saturday when [B.Z.] stayed the night with him." Defendant's statements suggest his knowledge of the offenses before being informed of the specific allegations against him and their relevance to the timeline and character of the events as reported by B.Z.

¶ 61　　　　Defendant further argues that the present case is analogous to *People v. Nestrock*, 316 Ill. App. 3d 1 (2000). There, the defendant faced criminal charges following a car accident that resulted in the deaths of two individuals. *Id.* at 3-4. The State theorized that the defendant purposefully caused the car accident while attempting to kill herself or to "feign suicide." *Id.* at 4. At trial, it presented a tape-recorded conversation between the defendant and Nick Heath, her close friend, that occurred the day after the accident. *Id.* at 4-5. The defendant did not know the

conversation was being recorded. *Id.* at 5. Heath testified that prior to the recorded call, the defendant made statements to him that indicated she was trying to kill herself at the time of the accident. *Id.* at 4. After being contacted by the police and having further communications with the defendant, Heath and another friend, Jason Taylor, decided to record Heath's next conversation with the defendant "because they had been contacted by the police and wanted to protect themselves." *Id.* at 5. During the recorded call, the defendant made incriminating statements. *Id.*

¶ 62 On review, the Second District found that the recording should not have been admitted into evidence and that its admission was barred by the eavesdropping statutes. *Id.* at 6. In so holding, it rejected the State's argument that the fear-of-crime exemption applied, finding Heath's and Taylor's testimonies showed that they did not "suspect that [the] defendant was about to commit a crime against them." *Id.* at 9.

¶ 63 We find *Nestrock* is distinguishable from the present case. Specifically, in that case, there was no evidence that the recording parties had a reasonable suspicion that the defendant was committing, was about to commit, or had committed a crime *against them or someone in their immediate households*. Rather, they were friends of the defendant who were otherwise unconnected with the underlying car accident, and who made statements indicating they wanted to protect themselves after being contacted by the police. As noted, this case, by contrast, concerned phone calls recorded by the mother of defendant's alleged victim following disclosures by the victim of defendant's alleged sexual abuse. Here, the record clearly supports a finding that Amanda had a reasonable suspicion that defendant committed a criminal offense against B.Z., a member of her immediate household.

¶ 64 Under the circumstances presented, we agree that the fear-of-crime exemption was applicable to the facts of this case and, thus, the admission of the recorded phone calls was not

barred by the eavesdropping statutes. Accordingly, the trial court committed no error in granting the State's motion *in limine* to allow the admission of those recordings.

¶ 65                                    C. Defendant's Text Messages

¶ 66        On appeal, defendant also argues the trial court abused its discretion by allowing the State to present evidence of his "sexually-charged" text messages with Amanda. He contends the evidence was both irrelevant to the charged offenses and unduly prejudicial.

¶ 67        Generally, "[a]ll relevant evidence is admissible, except as otherwise provided by law," and "[e]vidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Evidence of other crimes, wrongs, or acts" may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Additionally, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 68        A trial court's decision regarding whether "to admit [evidence of other crimes, wrongs, or acts] is reviewed for an abuse of discretion." *People v. Peterson*, 2017 IL 120331, ¶ 125. "The question is not whether the reviewing court would have made the same decision if it were acting as the trial court." *Id.* "Rather, the question is whether the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.*

¶ 69        Here, in finding portions of the challenged text messages admissible, the trial court noted the State's assertion that the texts were being offered to show defendant's intent and that

part of the allegations for each count against defendant was that the offenses were committed "for the purpose of sexual gratification or arousal of the victim or the defendant." The court also stated that it had considered the "timeframe" of the text messages, suggesting that their probative value was higher because they occurred close in time to the alleged offenses rather than "a week before, a week after." During defendant's trial, the court further explained its ruling as follows:

"I was weighing all the factors that I thought were well and appropriate in regards to weighing prejudice versus probative value, and I kept out some of it ***.

One of the reasons why I kept out some of it, the portions I kept out was, it seemed like it certainly reflected that maybe somebody had blocked [defendant] and he was trying to find methods around that. That would be something I could certainly see a jury holding that against somebody for trying to get around a block. So the prejudicial value of that compared to the probative value of that as to intent, I don't see where the probative value as to intent of him seeking sexual gratification, so that probative value as to that portion of it was much lower, and I kept that out.

Also, one of the other factors is what I did allow in, even though I'm allowing the State to argue it as to intent on the sexual gratification aspect, the actual act or conduct that's being purported in that is that he was, perhaps, seeking a relationship or a renewal of a relationship between him and another consenting adult, which is—the undue prejudice of that is lower because there's nothing illegal, nothing criminal in that. That is behavior that consenting adults take part in."

¶ 70 Here, we cannot say the trial court's decision to admit a portion of the text message communications between defendant and Amanda was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* The

record reflects the court engaged in the proper analysis, finding the challenged evidence was relevant and that its probative value outweighed its prejudicial effect. Notably, the court excluded portions of the text message communications on the basis that they were overly prejudicial. Further, it found the admitted texts were relevant to show, as the State argued, defendant's intent or state of mind. It noted that the texts were sent by defendant shortly before the charged offenses, *i.e.*, within a couple of hours. It also pointed out that the texts, in which defendant expressed his desire for sex, were relevant to allegations that the charged offenses were committed for the purpose of sexual gratification or arousal. Additionally, as determined by the court, the text messages described no criminal conduct, reducing their prejudicial effect. Under these circumstances, we find no abuse of discretion.

¶ 71 Additionally, even assuming that the trial court erred in admitting the texts, we agree with the State that any error would be harmless. An evidentiary error "is harmless where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original and internal quotation marks omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 72 Here, the challenged text messages consisted of only a small part of the State's case against defendant. Additionally, we find the State otherwise presented strong evidence of defendant's guilt. At trial, B.Z. testified and described the alleged sexual acts perpetrated by defendant. She also provided a detailed account of the alleged abuse during her Children's Advocacy Center interview. That interview occurred within days of the alleged abuse and was largely consistent with her trial testimony. Amanda's testimony established that the parties had a good relationship prior to the alleged offenses. She also described changes in B.Z.'s demeanor after the alleged abuse. Moreover, defendant's recorded statements to Amanda suggested

knowledge of the offenses before he was fully informed of B.Z.'s allegations against him. Although defendant denied any wrongdoing, the record fails to reflect any plausible motive for B.Z. to fabricate the allegations against defendant, the person she believed to be her biological father. Accordingly, we find that any arguable error in the wrongful admission of the challenged text messages was harmless error that would not require reversal of defendant's convictions.

¶ 73                                     D. Excessive Sentence

¶ 74          On appeal, defendant finally argues that the 90-year sentence imposed by the trial court was excessive. However, because we reduce defendant's convictions in connection with counts I and II and remand for a new sentencing hearing on the reduced charges, it is unnecessary to address this remaining contention.

¶ 75                                     III. CONCLUSION

¶ 76          For the reasons stated, we reduce defendant's convictions for predatory criminal sexual assault of a child in both counts I and II to the offense of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2022)) and remand for a new sentencing hearing on those reduced charges. We otherwise affirm the trial court's judgment.

¶ 77          Affirmed as modified; cause remanded with directions.

*People v. Love*, 2026 IL App (4th) 250894

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 23-CF-1241; the Hon. J. Jason Chambers, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Elizabeth Cook, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Erika Reynolds, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |